**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1067n.06

No. 11-6296

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Oct 10, 2012*

DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE UNITED |
| v. | ) STATES DISTRICT COURT FOR THE |
| | ) MIDDLE DISTRICT OF TENNESSEE |
| JOSEPH M. CARTER, | ) |
| | ) |
| Defendant-Appellant. | ) |

Before:  SILER and COOK, Circuit Judges; STEEH, District Judge[*]

COOK, Circuit Judge. Defendant Joseph Carter appeals his sentence of 240 months' imprisonment, arguing that the district court erred by overestimating his drug-quantity and failing to address his four arguments for a downward variance.  We affirm.

I.

Carter pleaded guilty to conspiring to manufacture and distribute MDMA in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Although the indictment did not specify the amount of drugs involved in the conspiracy, the government provided an estimate of 720 ounces during Carter's plea hearing. Using this drug-quantity estimate, Carter's Presentence Investigation Report ("PSR") calculated a

---

[*]The Honorable  George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

Guidelines range of 360 months to life, but limited that range to the statutory maximum of 240 months. 21 U.S.C. § 841(b)(1)(C).

Carter objected to the PSR's drug-quantity calculation. He also sought a 120-month downward variance, arguing that: (1) the Guidelines range overstated his culpability; (2) his attempted cooperation with the government warranted a reduced sentence; (3) his history of mental illness mitigated his wrongful conduct; and (4) the MDMA Guidelines lacked empirical support.

At sentencing, the government presented three witnesses, along with photographic evidence of Carter's MDMA laboratory, to support its drug-quantity estimate. The first witness, Noel Vadell, a chemist for the DEA, testified regarding Carter's use of safrole oil to manufacture MDMA. He recounted several conversations between Carter and the DEA, where the defendant admitted to acquiring one liter of safrole oil per month for nine months. Using an eighty percent conversion rate, Vadell estimated that nine liters of safrole oil would produce around 400 ounces of MDMA. Carter disputed this figure, arguing for a fifty percent conversion rate.

DEA Special Agent Matthew Chance testified regarding a controlled phone call he arranged between Carter and Jeremy Wright, a co-conspirator-turned-informant. During the recorded conversation, Carter said he "could have ready, possibly the following day, three or four ounces" of MDMA, and as much as sixteen ounces within a week. Agent Chance also recounted a conversation he had with Carter following the DEA's search of his home, where Carter admitted producing "around six to ten ounces" of MDMA per week. Wright's testimony corroborated this information,

adding that he would purchase from Carter "anywhere between two to eight ounces, around two or three times a month." Wright also stated that Carter's associates and girlfriend continued to supply him with MDMA while Carter was in prison, though it "wasn't the same product."

Given the opportunity, Carter offered no rebuttal to contradict the government's evidence. The district court then overruled his objections and adopted the PSR's sentence recommendation. The court explained, "I am imposing this [sentence] I think this is a fair, appropriate sentence, considering your criminal history, that—and that your previous conviction and your continuing not learning your lesson from the previous conviction, so this is for specific deterrence and general deterrence."

Carter now appeals.

## II.

Carter challenges both the district court's drug-quantity estimate and the reasonableness of his sentence. We review the first of these claims for clear error. *See United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008); *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004). In the absence of government seizure of drugs from the defendant, "it is the duty of the District Court to estimate the amount." *United States v. Zimmer*, 14 F.3d 286, 290 (6th Cir. 1994) (internal citations omitted). The evidence underlying this approximation must "have a minimal level of reliability beyond mere allegation." *Sandridge*, 385 F.3d at 1037 . To this end, the court may consider

"circumstantial evidence," *United States v. Gauna*, No. 10-6193, 2012 WL 2217051, at *3 (6th Cir. June 18, 2012) (citing *United States v. Elder*, 90 F.3d 1110, 1127 (6th Cir. 1996)), including "similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved," *Sandridge*, 385 F.3d at 1037.

We also review the district court's sentence for reasonableness, which has both procedural and substantive components. *Gall v. United States*, 552 U.S. 38, 51 (2007). The Supreme Court in *Gall* defined procedural error as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id*. Procedural reasonableness, however, does not require the district court to address "any and all arguments" for alternative sentences, *United States v. Vonner*, 516 F.3d 382, 387 (6th Cir. 2008) (en banc), so long as the context and record "'make clear' the court's reasoning," *United States v. Liou*, 491 F.3d 334, 339 n.4 (6th Cir. 2007) (quoting *Rita v. United States*, 551 U.S. 338, 357 (2007)).

Though Carter specifically mentions only the procedural reasonableness of his sentence, to the extent that some of his arguments border on a substantive challenge, out of an abundance of caution, we review such claims for abuse of discretion. *Liou*, 491 F.3d at 337 (noting that the "border between factors properly considered 'substantive' and those properly considered 'procedural' is blurry if not porous") (internal citations omitted). "A sentence is substantively unreasonable if the district court selects a sentence arbitrarily, bases the sentence on impermissible

factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Camiscione*, 591 F.3d 823, 832 (6th Cir. 2010) (internal citation and quotation marks omitted). Reviewing courts may "credit[] sentences properly calculated under the Guidelines with a rebuttable presumption of reasonableness." *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006); *see Rita*, 551 U.S. at 347.

A.      Drug-Quantity Estimate

Carter first challenges the sufficiency of the drug-quantity evidence. He asserts that the government misstated Wright's testimony by arguing that Carter gave him between six to eight ounces of MDMA around two to three times per month when Wright actually testified that the range was "between two to eight ounces." Regardless of what Wright said, the court also heard Agent Chance testify that "[Wright] said he was receiving approximately six to eight ounces a week." A district court is free to give greater emphasis to one witness's statement over that of another. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story . . . that finding . . . can virtually never be clear error."); *Jeross*, 521 F.3d at 570 ("We 'afford the district court's credibility determinations regarding witness testimony great deference.'") (quoting *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007)). Thus, Carter's first evidentiary challenge lacks merit.

As for Carter's challenge to the adequacy of the evidence underpinning the estimates, the district court had the expert's testimony and multiple photographs of Carter's MDMA laboratory. It could properly rely on this evidence regarding the capacity of Carter's drug laboratory when assessing drug quantities. The government's expert, in addition to his own observations of the lab, relied on Carter's admissions in making his conversion estimate, upon which the district court relied. Regarding the glassware in Carter's lab, the expert testified that he agreed with the government's assessment that it was "lab grade glassware," also noting further that Carter's "chemistry knowledge is very impressive" and that he "[knew] what he[] [was] doing." Carter offered no contrary evidence in rebuttal.

Carter also argues that a "conservative estimate" should take the following into account: (1) thirteen months Carter spent in prison for violating his supervised release; (2) winter months when there is limited access to safrole oil; (3) variations in production (so-called "weak" versus "strong" weeks); and (4) early weeks in the conspiracy without MDMA production. The court heard sufficient testimony to reject this first argument. The government specifically asked Wright whether he had received any MDMA "from anyone working with [Carter]" while Carter was in prison. Wright answered in the affirmative, adding that his suppliers during this time "would vary." He also specifically identified Carter's girlfriend and William Sharpton, another member of the conspiracy whom Carter had taught how to process safrole oil, among his list of suppliers around this period. Since both Carter's girlfriend and Sharpton participated in the conspiracy under Carter's leadership, their production attaches to Carter. *See United States v. Jennings*, 83 F.3d 145, 150 (6th Cir. 1996).

Carter's last three arguments merely restate the same issue. Carter challenges the district court's findings regarding the rate and duration of MDMA production (thirty ounces per month for twenty-four months). Even if we accept Carter's assertion that his production varied from week to week, the government's evidence supports a range of twenty-four to forty ounces per month. The government expressly selected an average of thirty ounces per month as being "the lower end" of the drug-output range, providing a "conservative estimate" of the total amount. As the government noted during Carter's sentencing, taking "the high end [of the estimate] . . . say forty ounces a week for the full three years, [would give an estimate] into the thousands of ounces." Finally, the government discounted an entire year from its quantity calculations, to account for the early weeks of the conspiracy and the months when Carter's absence prompted lower production.

B.      Reasonableness

Carter also argues that the district court failed to address each of his four arguments for a downward variance, detailed in his sentencing memorandum and repeated at sentencing. To support his procedural unreasonableness charge, Carter cites our decision in *United States v. Thomas*, 498 F.3d 336 (6th Cir. 2007). There, the district court did nothing more than acknowledge receipt of the defendant's sentencing memorandum, without mentioning any of his arguments for a reduced sentence, which "le[ft] us unsure as to whether the district court . . . misconstrued, ignored, or forgot [the defendant's] argument." *Id.* at 341. We noted that the relevant 3553(a) factors, "went unmentioned and unaddressed." *Id*. In doing so, we contrasted the *Thomas* case with *Rita*, where

the Supreme Court found that a district court's repetition of the defendant's "conceptually simple arguments" presented an adequate, "though brief," explanation, *Rita*, 551 U.S. at 356.

A contextual analysis of the district court's statements shows that it adequately considered Carter's arguments and satisfactorily explained its sentence. After hearing witness testimony regarding drug quantity, the court rejected Carter's objections to the PSR. The court invited both the prosecution and defense to summarize their positions regarding the relevant sentencing issues, asking the government to respond to Carter's cooperation arguments. The court questioned the government further, gleaning from it an opposition to downward departure.

Having heard all the arguments surrounding Carter's sentencing factors, in addition to substantial evidence supporting the government's drug-quantity estimate, the court sentenced Carter to 240 months' imprisonment. Notably, the court's sentence also required that Carter participate in substance abuse treatment and a mental health program, belying the defendant's claims that the court failed to consider his mental illness argument. Upon the government's request for clarification, the court repeated that it had overruled Carter's objections and confirmed it had adopted the PSR's calculations, including "the base offense level of 36, the leadership role increase of four levels, and the unlawful discharge increase of two levels."

Finally, the sentencing court emphasized the need for deterrence, citing the defendant's failure to "learn[] . . . from the previous conviction," and explained its sentence as a means of achieving both "specific deterrence and general deterrence." The court expressed disapproval of

Carter's recidivism and the fact that Carter began manufacturing MDMA while on probation for near-identical charges. The court's multiple references to Carter's "criminal history" and its declaration that Carter had not learned his lesson reflect an adequate consideration of the second § 3553(a) factor. The record satisfies us that the court considered the defendant's objections, overruled them, and stated its reasons for its sentence.

III.

We AFFIRM the judgment of the district court.